MELLEN *v.* TOWN OF LANSING.

*(Circuit Court, N. D. New York.* August 12, 1881.)

1. BONDS IN AID OF RAILROADS—TOWNS, CITIES, AND VILLAGES.
    Where, by a state law, towns, cities, and villages were authorized to issue bonds in aid of railroads along the lines of such railroads, or interested in the construction thereof, in any county through which the said railroad shall run, *held,* that the power to so issue bonds is confined to towns in any county through or near which said railroad or its branches may be located.

2. SAME—ROUTE TO BE FIXED—CONDITION PRECEDENT.
    The route and location involve the starting point and the terminus, and must comprehend the entire structure throughout its length, and before a town has authority to issue bonds, the board of directors of the railroad company must have exercised the discretionary power vested in them to establish a branch railroad through the county in which such town is located, as it was not the intention of the statute that any town should issue bonds unless the road should run through it, or through the county in which it is situated.

On Motion for New Trial.

*E. C. Sprague,* for plaintiff.

*H. L. Comstock,* for defendant.

BLATCHFORD, C. J.　This suit is brought on coupons cut from bonds purporting to have been issued by the town of Lansing, in Tompkins county, New York, and bearing date December 1, 1871. The coupons sued on are 47 in number, falling due September 1, 1879, cut from 47 bonds, the principal of which bonds amounted to $38,000, the coupons amounting to $1,330. The suit was tried before the court and a jury, and the plaintiff had a verdict, under the direction of the court, for $1,457.59, being the amount of the coupons and interest thereon. The defendant now moves for a new trial on a bill of exceptions, containing exceptions taken at the trial. The bonds state on their face that they are obligations of the town, and that they are issued under the provisions of the act of the legislature of New York, passed April 5, 1866, entitled "An act to facilitate the construction of the New York & Oswego Midland Railroad, and to authorize town to subscribe to the capital stock thereof," and the several acts amendatory thereof and supplementary thereto, especially the act entitled "An act to authorize the New York & Oswego Midland Railroad Company to extend its road, and to facilitate the construction thereof," passed April 5, 1871. The bonds purport to be attested by the hands and seals of three persons, who style themselves "duly-appointed commissioners of said town of Lansing," and the bonds state that they have caused each of the annexed coupons to be signed by one of their number.

The statutes set up in the complaint as those under which the town was authorized to issue the bonds, are the said act of April 5, 1866, (Laws of New York, 1866, vol. 1, c. 398, p. 874;) the act of May 15, 1867, (Laws of New York, 1867, vol. 2, c. 917, p. 2290;) and the said act of April 5, 1871, (Laws of New York, 1871, vol. 1, c. 298, p. 586.) The complaint alleges that, by the provisions of said acts, the said town was authorized to execute, issue, and deliver said bonds; and it refers to said acts, and makes them a part of the cause of action.

The act of 1866 provides for the appointment, by the county judge of the county in which the town is situated, of not more than three commissioners, to carry into effect the purposes of the act. The commissioners are to execute the bonds under their hands and seals, and to issue them. When issued lawfully, they become the obligations of the town. All the statutes then speak of them as bonds issued

by the town. In order to make them bonds of the town there must be commissioners appointed. At the trial the plaintiff offered in evidence a petition to the county judge of Tompkins county, by freeholders and residents of said town, requesting the appointment of the three persons who afterwards executed the bonds, as commissioners to carry into effect the purposes of said acts "in accordance with the provisions of said acts." The defendant objected to the admission in evidence of said petition, on the ground that there was no evidence to show that the county judge had jurisdiction to appoint commissioners for said town, and on the further ground that there was no law giving him such jurisdiction, and that he had no authority whatever to appoint commissioners for said town. The court overruled the objection, and admitted the petition as evidence, and the defendant duly excepted to the ruling, under an objection by the defendant on the same grounds, and a like ruling and exception. A paper was admitted in evidence, signed by the county judge, appointing the said three persons commissioners to carry into effect the purposes of said acts, "in accordance with the provisions of said acts;" and under a like objection, and a like ruling and exception, the oath of office of the commissioners was admitted in evidence. The coupons sued on, and the 47 bonds, were admitted in evidence, under an objection and exception by the defendant that the county judge had no jurisdiction or authority to appoint any commissioners for said town to act for it in bonding it in aid of said railroad. At the close of the evidence on both sides the defendant requested the court to direct a verdict for it "on the ground that the county judge had no power to appoint commissioners for the town," and that "no action by the railroad company towards the location of its road having been shown, and no determination by the officers of the railroad to build the road on any such route, the road was not located at all." The court refused to direct as requested, and the defendant excepted to the ruling. The court directed the jury to find a verdict for the plaintiff for $1,457.59, and the defendant excepted to such ruling or direction, and the jury rendered said verdict.

These proceedings raise the question whether there was any statute authorizing the bonding of the town, either by direct description or otherwise. If there was not, there was no jurisdiction to appoint the commissioners, and there were no commissioners and no bonds. It required special legislative authority to enable the town to issue bonds in aid of the railroad. Even without what is on the face to these bonds, every person taking them or their coupons is referred o:

the source of authority to issue them in some statute. A *bona fide* purchaser of them is thus referred, equally with every other taker. There may be no informality or irregularity or fraud or excess of authority in an authorized agent capable of operating to the prejudice of a *bona fide* holder, but there must be some statute providing for the constitution of authorized agents. Every one is bound to inquire and take notice whether there is, in fact, such a statute. If there is not, there is a total want of jurisdiction and authority in county judge and in commissioners.

There is no authority in the act of 1866 for the issuing of bonds by any town in Tompkins county. That act is confined to towns and cities in eleven counties, which are named, not including Tompkins. The act of 1867, as amended by the act of March 31, 1869, (Laws of New York, 1869, *c.* 84, p. 142,) authorizes the board of directors of the company to construct a branch railroad from the line of its railroad "at any point in the counties of Chenango or Madison, through the counties of Chenango, Madison, Cortland, Cayuga, to the city of Auburn, in the county of Cayuga, wherever, in the judgment of the directors, the same shall be for the interest of said corporation;" and also, "in like manner," to construct a branch road from the village of Delhi to the line of said road; and also a branch road from the village of Ellensville to the most feasible point upon the line of said road in the county of Sullivan or Orange; and also a branch road in the counties of Madison, Oneida, or Oswego. Then the act, as so amended, gives to towns, cities, and villages along the line of the said branch railroads, or interested in the construction thereof, in any county through which said railroad shall run, "the same power to issue bonds to aid in the construction thereof" as is given by that act as so amended, and by the said act of 1866. It is not contended by the plaintiff that there is anything in that act of 1867, as so amended, which authorizes the issuing of bonds by any town in Tompkins county.

We come now to the act of 1871, under which the power is asserted to exist. It is provided as follows by section 1 of that act: "The New York & Oswego Midland Railroad Company are hereby authorized and empowered to extend and construct their railroad from the city of Auburn, or from any point on said road, easterly or southerly from said city, upon such route and location, and through such counties, as the board of directors of said company shall deem most feasible and favorable for the construction of said railroad to any point on Lake Erie or the Niagara river. The said New York &

Oswego Midland Railroad Company are also authorized and empowered to connect their railroad at any point in the county of Delaware with the Erie Railway, and to locate and construct such spur or branch railroad as shall be deemed necessary by the board of directors of said company to make such connection in the county of Delaware; and the said New York & Oswego Midland Railroad Company are further authorized and empowered to extend and construct the branch road to the village of Delhi; from said village, or some point near the same, northerly to the Albany & Susquehanna Railroad, and easterly to or near the village of Andes, and the village of Margaretsville, in the county of Delaware; and any town, village, or city in any county through or near which said railroad or its branches may be located, except such counties, towns, or cities as are excepted from the provisions of the general bonding law, may aid or facilitate the construction of the said New York and Oswego Midland Railroad, and its branches and extensions, by the issue and sale of its bonds in the manner provided for" in the said act of 1866, and the acts amendatory thereof and supplementary thereto. This statute does not give power to every town in the state, nor to any town by name, nor does it designate by name any county. It confers power on any town "in any county through or near which said railroad or its branches may be located." What is meant by "located?" The words are very vague and loose. "Through or near which" probably refers to "county," as not only is that the last antecedent, but, if the words "through or near which" refer to "town, village, or city," the words "in any county" would be superfluous. So, if Lansing is a town in a county through or near which the railroad or its branches "may be located,"—that is, if Tompkins county is such a county,—then Lansing may issue its bonds to aid the construction of the railroad, and its branches and extensions. The act of 1866, section 15, empowers the company to build two branch railroads, which are designated. The act of 1867, as amended in 1869, empowers it to construct other branch railroads. The act of 1871 empowers it to construct other extensions or branches. By the act of 1866 the branch railroads thereby authorized to be built are to be built "whenever, in the judgment of the directors, the same shall be for the interest of said corporation." The same language is used in the act of 1867 in regard to the branch railroads thereby authorized. In the act of 1871 the authority is to extend and construct their railroad (1) from the city of Auburn, or from any point on said road, easterly or southerly from said city; (2) upon such

route and location, and through such counties, as the board of directors shall deem most feasible and favorable for the construction of said railroad; (3) to any point on Lake Erie or the Niagara river. These three things concern (1) the starting point; (2) the route; and (3) the terminus. But the "route and location" necessarily involve the starting point and the terminus, as there cannot be a complete route and a complete location which do not comprehend the entire structure throughout its length. So the starting point and the terminus, as well as the transit route between the two, are embraced within the "location" which the board of directors are to determine upon as "most feasible and favorable" for the construction of the railroad, in respect to the extension now under consideration. So, in regard to the second branch railroad authorized by the act of 1871, it is to be such a one "as shall be deemed necessary by the board of directors of said company," and the other extensions authorized by the act of 1871 must necessarily have a "route and location," or be "located."

It is not here contended that either the railroad, or any one of its said branches, was located through or near the county of Tompkins, in the sense of the act of 1871, unless it was the extension so provided for to a point on Lake Erie or the Niagara river; and it is contended that that was located through Tompkins county, and through the town of Lansing. In *People* v. *Morgan*, 55 N. Y. 587, the said acts of 1867, as so amended, and 1871 were under consideration in respect to the town of Scipio, in Cayuga county. The court of appeals held that that town might be embraced in the act of 1867, as so amended, but that before it could have the authority under that act as so amended to issue bonds, the board of directors of the railroad company must have exercised the discretionary power vested in them to establish a branch railroad through the county of Cayuga; that the counties through which the branches should run were the only ones where towns were empowered to issue bonds; that it was not the intention of that act, as so amended, that any town should issue bonds unless the road should run through it, or through the county in which the town was situated; that such result might follow if the town bonds should be issued before the branch road was located, or the board of directors of the company had even determined whether or not they would exercise the privilege of constructing the branch, and that it did not appear in that case, in any manner, that the branch to Auburn had been located, or even determined upon, when

the proceedings then under review were instituted. The case was a *certiorari* to review the proceedings of the assessors of the town in the matter of bonding it in aid of said company. In respect to the act of 1871 the court held that that act made the location of the road or branch a condition precedent to the right to issue bonds; that there was no proof that any such location had been made at the time of the proceedings to bond the town; that there was no evidence of any authority to bond that town in aid of the railroad; and that the most that appeared was that acts had been passed purporting to authorize the bonding of the towns in Cayuga county in certain events, which were not shown to have occurred. The court held this objection fatal, and vacated the proceedings. The Code cited does not decide what is "location," or what is sufficient evidence of location. It decides that there was no evidence of location in that case. It implies that location is something which is to follow a determination by the board of directors to construct the branch, and it would seem further to imply that where location is established such prior determination may be inferred.

It is quite clear that such decision of the court of appeals of New York, in regard to the act of 1871, gives a correct view of the act. The location of the first branch authorized by that act was a condition precedent to the right of the town of Lansing to issue the bonds in question, and is a condition to be enforced even where the bonds or coupons are in the hands of a *bona fide* holder. The absence of such location is as fatal as if there were no act. The location is made by the act itself expressly to precede the aid.

It is not proper to decide what evidence must be given to be sufficient evidence of location. It is only necessary to say that the evidence of location given in this case was not sufficient, and that there was error in directing a verdict for the plaintiff. On another trial the difficulty may, perhaps, be obviated. With a view to showing precisely what the insufficiency of evidence was, it is necessary to examine it. This is the whole of it:

"Egbert Williams, sworn on behalf of plaintiff, testified as follows: I reside in Lansing. Have lived there about 55 years. In 1871 or the fall of 1870 a road was graded into the town of Lansing. In 1872 it began running. Lansing is south and a trifle east from Auburn. The railroad started from Freeville, Tompkins county, in the town of Dryden, ran through part of Dryden and Lansing and into the towns of Geneva and Venice, and thence into Scipio, and there stopped. Cars were run on it with the Midland name on—N. Y. & O. M.—and other cars. Freeville is 10 miles west of Cortland. There was a

road from Freeville to Cortland, and from Cortland to Norwich. The main line of the Oswego Midland Railroad goes through Norwich. From where the road stopped in Scipio it was about 11 miles to Auburn. I went once from Cortland to Norwich on a branch of the New York & Oswego Midland Railroad. The road begins south from Auburn,—about seven miles from Auburn,—runs southerly through the town of Lansing, and goes to Freeville. This road stops there. A railroad, called the Utica, Ithica & Elmira, runs from Elmira, through Ithaca and Freeville, to Cortland. The branch from Norwich to Cortland is by the New York & Oswego Midland Railroad. I went by stage from Scipio to Auburn. *Cross-examined.* The Utica, Ithaca & Elmira is another road, and runs to Freeville and through it. It was understood that this branch of the New York & Oswego Midland Railroad began at Freeville. When the proceedings to bond the town began, no work had been done on the road. The grading was begun in 1872, I think, and finished in 1873. It was some time after my appointment as commissioner that grading was begun. I think it was begun in the fall of 1872. I think grading was not begun until after I was appointed. *Redirect.* Grading was not commenced till after we were appointed commissioners, [October 21, 1871.] There was surveying in the summer previous. I saw stakes being driven where the road was afterwards graded."

This witness was one of the three commissioners who issued the bonds.

It is necessary, not only that the branch should have been located, but that it should appear to have been located by this company. Surveying a route first, then grading it where it was surveyed, and then making a railroad where it was so graded, amounts to nothing, unless it be shown that the railroad so made was made by this company. It was only to aid the construction of this railroad, and its branches and extensions, that this town could issue its bonds. It is here that the evidence is defective. There was surveying before the commissioners were appointed, but that it was done by this company does not appear. Stakes were then driven where the road was afterwards graded, the grading having been begun after the commissioners were appointed. But it does not appear that it was graded by this company. Nor does it sufficiently appear that the road made from Freeville through Dryden and Lansing, into Genoa, Venice, and Scipio, and which began running in 1872, was a road constructed by this company. The witness says that cars were run on it with the name of this company on them, but he also says that other cars were run on it. As it connected at Freeville with the road running from Freeville to Cortland, and there was a branch of the Midland road from Cortland to Norwich, the Midland cars may very well have been sometimes used from Cortland to Freeville, and on, by con-

struction track, under some arrangement. This does not show that the road was the road of the Midland Company. The expression of the witness that it was understood that this branch of the Midland road began at Freeville amounts to nothing as proof that this was a branch of the Midland road. There is nothing else on the subject in the testimony. As Freeville was not a point on the Midland road, it could not, under the act of 1871, be a starting point for the first extension authorized by that act, and the starting point must be Auburn. But it does not follow that the starting point may not be Auburn, and the road be located, within the act, as an extension from Auburn, although work in surveying and grading and otherwise, in a direction towards Auburn, be first done at a distance from Auburn. At the trial it was supposed that the evidence showing that this road was a branch constructed by the Midland Company was more full and distinct, but a careful consideration of it, as it appears in the bill of exceptions, leads to the conclusion that a new trial must be granted for the reasons above set forth.

I have not overlooked the decision in *Smith* v. *Town of Yates*, 15 Blatchf. 89. The question there was whether the town was a town "situate along the route" of the railroad. It was contended that the route ought to have been located in the manner prescribed by the general act under which the company was organized. But the court held that, as the road had not yet been built, the language referred to a town on the contemplated or proposed route of the road. The difficulty in the present case is that the branch in question is not shown to have been a contemplated or proposed or constructed road of the Midland Company.

The motion for a new trial is granted.

See *Town of Thompson* v. *Town of Perine,* notes of cases, *post.*